The case is number 24-8028 in re MCP 191 and associated cases 241814, 241859, 241860, 241861, 241884, 241886, 241922, 241927, 241969, 242013, and 242061. At this time, would Counselor for the Petitioners, Securus Technologies, LLC, et al., come to the podium and introduce himself on the record to begin? Thank you, Your Honors. Scott Engstrich for Petitioner Securus, and on behalf of the IPCS Petitioners, I'd like to reserve four minutes for rebuttal. I will give you three. Sounds good. Thank you, Your Honor. Your Honors, the agency's order is unlawful for multiple reasons. First, when Congress amended Section 276B, it gave the FCC two distinct duties, but the FCC treated them as though they were a single duty, and as a result... Before we get into this, do you want to say anything about Venue and... In fact, I do, but I was going to highlight the substantive arguments just in case we get sidetracked by Venue for a while. I'm happy to jump straight to Venue, though. Why don't you just start with Venue? Absolutely, Your Honor. The case shouldn't be in this court. The record should have been filed in the Fifth Circuit. Are you making a discretionary transfer point, or are you making a jurisdictional point? So, the argument raised in our brief is a mandatory transfer point that both because there was only one petition... What does mandatory transfer mean? It means that under Section 2112A1, we fit one of the two conditions under which the record shall be filed in the court where the first filed petition was filed. That was ours, in our home circuit of more than two decades. And then 2112A5 says that all other cases shall be transferred to the court in which the record was filed. So, we're asking the court to correct the misfiling of the record that occurred. So, that's not a... I'm just trying to understand. You're challenging what the Fifth Circuit did, or what the panel did in conducting a lottery, correct? We're saying that... Yes or no? Are you saying that... I think from a practical perspective, Your Honor... So, if this were a district court litigation, the judicial panel has a whole bunch of rules and processes and motions. There's one rule for appeals, it's Rule 25, and it describes a purely ministerial process. So, I don't think it would have been right for the FCC, as the agency whose order is being challenged, to decide unilaterally... These other three challenges don't count. And, therefore, refuse to go through that ministerial process. It went to the panel, then the panel then conducted the lottery and sent it to us. And, I think that's what's on the record. And, certainly, we have discretion to transfer. Yes. But, you seem to be making a separate argument that even apart from our discretion to transfer, somehow, even if we were to choose to exercise our discretion not to transfer at this stage, that there's some legal problem with us having the case. I'm trying to understand, what is the source of that argument? I think the source is... We look at Southland Miller, I think Judge Wilkie's persuasive opinion in Bingham, then Judge Scalia's opinion in Western Union, all recognize that to count as a petition instituting proceedings for purposes of 2112A1, the appellate court has to have jurisdiction over the petition. Well, that could be just, we don't have jurisdiction over the petition. So, the petitions are here. You could say, somehow, we don't have jurisdiction. But, we've been transferring them pursuant to a statute that gives them to us. So, that's where I'm just lost in your argument. I'm not... Are you saying we are supposed to say that the panel that conducted the lottery erred? I think you're supposed to say, ultimately... Because you sought mandamus on that, and that was denied. That's correct. Typically, in the district court action, if you have a problem with the panel doing it, you seek mandamus from the circuit court. So, it seems odd that we would then de novo, not even under mandamus, now second-case the panel. We sought mandamus against this court. Yeah, I understand that. But, I'm saying, in the provisions for a, if I understand it, for a district court, effective lottery, the way you can review the determination about whether to send it off to the other court from the multi-district, when the multi-district panel makes that decision, that's mandamus. There's no provision that I can find for what happens if you want to say that the lottery was misconducted. That's true, Your Honor. And that's why we think it falls upon the transferee court to figure that out.  Because somebody has to. Otherwise... Why would it be us under de novo standard, rather than, I don't know, the circuit court of whatever, or the Supreme Court of, through a mandamus? I just don't get where you're getting that from. I think that 2112A1 sets out clear rules. I think it calls for the transferee court to figure this out. If we're under a discretionary standard, we think the standard applies here. Our petition was the sole initially filed petition that challenged a portion of the order that was then challengeable. Each of the other three petitions expressly say, you know, the CJRC petition, we believe that the only portion of the order published in the Federal Register, or the only portion of the order published in the Federal Register, then, is reviewable at this time. That is not the order we are challenging. And yet, they filed anyway. The Pennsylvania Prison Society says the same thing. The Daris petition says something differently. But it says, we do not claim to be aggrieved by the limited portion of the order then appealable. Published. Those are... This court recognized that in its orders to show cause. That those improperly invoked the Court of Appeals... I'm so sorry. My clock is not showing any time at all. I'm sorry, sir. There's 15 minutes left. Okay. Is it showing now? No, it's still not showing. Is there a way to make it so the clock can show on his... Not for me. Okay. I don't know if this is a problem just for me or if it's everybody else's problem too. I can glance over it. I just want to make sure I have time to get to the merits points. We could spend all day. Don't you worry. Thank you, Your Honor. I appreciate it, Judge Moffitt. We're not going to sit down without us talking about the merits. I appreciate that, Your Honor. Can I sort of just... Yes. Maybe pulling back and just asking a practical question. You're sort of going through the different times people filed. What should the other petitioners have done to get the lottery I think they wanted or deserved? Given this publication schedule here. I don't think they could have. Unless they could claim to have been harmed by the limited portion. And I'll step back and say, they've been doing this for two and a half decades. That happens all the time. Agencies issue orders in separate pieces. Agencies take things one step at a time. Those separate things are considered the same order for purposes of the 21-12A-5 transfer provision. And I have found myself in positions where the case that I filed ended up in some other court because somebody else was harmed by an earlier order that I had no basis to challenge. And, you know, the ox gets gored in both directions on these. Too bad, so sad, and it's unfortunate. But there was nothing they could have done to throw their hat in the lottery due to the way this was done. Just as if we had chosen not to file against the dismissals that had grieved us and somebody else chose to file because they would have benefited from the clarification that the FCC refused to give, their petition would have controlled the venue and we would have been out of luck. Or if we had waited and for whatever reason the second part of the order took three months to get published and we didn't file, we would have lost our chance to challenge those dismissals. So, yes, it's a weird situation, but it's not unique. We cited this in our transfer motions. I don't know that we had space to put it in the briefs here. But there was a large rulemaking back in 2018, which the FCC did in two stages. Two people challenged the first part of the rulemaking, only one of them early, and it went to the Ninth Circuit. And then 25 people challenged the second one, and it got lotteryed to the Tenth Circuit, and they sent it to the Ninth Circuit. Nobody wanted to be in the Ninth Circuit and challenge the second order. There was nothing they could have done. That just happens under the 2112A system. And so there was nothing they could have done. Maybe I'm missing a point, but one version of your argument is that this is incurably premature, the filing. But the version that you're now pressing, which I don't say is inconsistent with that position, but it's slightly different, which is they're just not aggrieved at all by the actual initial order that was published. So in other words, it's different, you would say, than a case in which, let's say they are aggrieved by it, but they're not because it's not final and there's an issue about whether there's a pending petition for reconsideration. This is just an order that has nothing to do with them. Exactly. So in one sense, these are timely petitions because that portion of the order was appealable then. But their petition said, we're not actually challenging that. We want to challenge this other thing that isn't then appealable. So if they had said, and if it were true, I mean, I don't mean this court needs to, you know, assess that. I mean, I think if it were true, they would have said it, that the portion of the order then published hurt them. How could the waiver or clarification have been sought pre-publication? Oh, it couldn't have been. Didn't you seek it? No, we sought it post-publication. Oh, it couldn't have sought pre-publication. So there's a second issue. Sometimes the FCC issues adjudications in separate documents, and those are appealable when they're released. But when you sought the thing that generated the FCC's decision, the denial, there was no rule in place from which to seek a waiver? Of course there was. We sought, we had, Securus had on the market, and my colleague, Mr. Berg, knew about these, but Securus had on the market alternative pricing plans. And the FCC made some rule changes in 2020 and 2021, the effect of which was to make it impossible for Securus to offer those anymore. And those rule changes had to do with the jurisdictionalization of telephone calls and weather in the world in which the FCC couldn't regulate both. They found one or the other. We asked for a waiver of those rules back in 2021 so that we could keep offering those popular plans. We asked for clarification back in 2021 of the then-effective rules governing how you can pay profits to incarceration facilities, separate and apart from the two-cent adder that was then in effect. So there were rules that were in effect that we— No, no, of course we were seeking, we shook back in 2021, and then three years go by, we don't get the relief, and the FCC says, we're dismissing it as moot because things that will take effect at some future point will give you the relief you wanted even though you don't have it in the here and now. And that's not how I understand mootness to work. We were agreed, and we continue to be agreed. Take the clarification. Even under the original plan, the new site commission ban that supposedly mooted our need for clarification wasn't going to take full effect until April of next year. And so providers were going to continue operating under the contracts as to which we thought clarification was needed until April of next year. There is no way our need for clarification in the here and now was mooted, at least as to those contracts, when they would continue to be in effect until April of next year. And now the FCC has waived the dates. There's a new order. I'm probably going to post on a website a draft version later this afternoon. I don't know what the new rules will be. But we could have benefited and would have benefited and possibly will still benefit from that clarification. And the same is true of the waiver. The new rules allowing alternative pricing plans weren't set to take effect until November. The rejection was in June. But even then, parts of the rules had to go through OMB approval, which they have not gone through, in part because when the FCC did the waiver around the same time, it pulled down the request for OMB approval. So we still don't have final rules governing our new alternative plans. We were harmed. We sought review in our home circuit, which 2344 says we get to do. And the only way we should be knocked out of that is under 2112. And we should not be knocked out of that through incurably premature petitions by people who say I'm not actually challenging the thing that I'm challenging. And I know they've said repeatedly throughout the life of this case that they only did it because we said we were challenging the full order. There's no polite way to say how false that is, Your Honor. We were explicit in our petition for review to the Fifth Circuit that the only thing we were seeking through that first petition was a decision vacating the dismissal of our waiver and clarification petitions. Am I right that the order that came down from the FCC purports to be embedded in the rule that's now published, or is that wrong? No. So this is what I was going to say. Sometimes they put out adjudications. Sometimes they put out rulemakings. Sometimes they put out... And the rules are different for when you can appeal, those two things. And sometimes they smoosh them together. Not the Federal Register publication, not the Code of Federal Regulations rules, but the actual document that is openly published in the FCC record has both things in them. And there was a lot of confusion back in the 80s, and the FCC adopted a rule in response to the Adams decision from the D.C. Circuit. So in that setting, when that document comes out, that's what triggered the incurably premature petition? No. That would have let us petition for review as soon as the order was released to the public. We ended up waiting until the Federal Register published the one small portion. But what's absolutely clear is that the new regulations, which is the only thing that counsel for the public interest petitioners say harmed them, that wasn't published then. I understand that. And that publication is necessary. I understand that too. And so they were incurably premature?  I'm just trying to understand factually. The FCC action or document that triggers the petitions you're contending are incurably premature is the document that smooshed the two things together? No. The document that had to have come out first for those DARE and CJRC and PPS petitions not to have been incurably premature was the Federal Register publication. I understand that. That's a legal point. Right. In the world, the petitions followed what document? What was the immediate recipient document? Our petition for review. Our petition for review was the immediate recipient document. Your petition for review was filed in response to the document that smooshed two things together? We filed within 10 days of the Federal Register publication of the portion of that smooshed together document that dismissed our petitions for waiver and for clarification as moved. Just so I get your chance to respond to this point, since they cite Craker, I think is our case. Yes. They analogize it too. And I know you don't think it has anything to do with this case, but insofar as there's an analogy, the idea would be to the extent it's unclear what the state of the world is from the FCC's point of view. Even though it's possible, ultimately, if you read everything correctly, you could figure it all out, but to the extent that there's a lack of total clarity as to what the FCC was up to at that moment, then I take it their point is there's an analogy to Craker in filing a protective petition, which is then followed by a timely petition that then cures it. And they say you can do that under the Hobbs Act. I know you say you can't, but what's your answer to that? I understand what the formalist answer would be, which doesn't make it a wrong answer. Oftentimes, it's the right answer. Is there a non-formalist answer to them as to why they're wrong? Sure. So I think the claim of confusion is specious. The rules for when one challenges a rulemaking are absolutely clear, and in fact, we know it's clear because each of the petitioners said we don't think the part we want to challenge is in fact challengeable now. And Craker was a very different situation. Craker waited until he lost at the DEA and filed his appeal to this court. I'm not sure what it was called, appeal or petition for review, and then sought rehearing. And under the DEA's process, this court found, and I'm not a DEA lawyer, I'll take it as true, that the DEA rehearing process is fishy. It may not really exist. And so what this court was unwilling to do was to say that Craker's decision to file that rehearing petition rendered the final decision non-final as to him, whereas in the Hobbs Act context where 47 U.S.C. 405 gives you a clear statutory right to reconsideration, a party that files one of those petitions renders a final order non-final as to them. Now stepping back, the whole incurable and premature rule comes from Western Union, which is not a rehearing case. Western Union is a gun-jumping case. And the reason that this rule is jurisdictional and the D.C. Circuit applied it and has been applying it ever since 1985 is because Section 2342 at the bottom contains jurisdictional language. Unlike lots of other rules that we used to call jurisdictional but the Supreme Court has explained are now claims processing rules, 2342 begins, or ends, jurisdiction shall be invoked by doing something. So it has the very jurisdictional language that's often missing. And this is a formless answer, but courts don't get to make exceptions to jurisdictional rules. So the second petitions that Dayler and the others filed, they were perfectly valid petitions for review. They invoked the court's jurisdiction, wherever they filed them, to hear challenges to the rulemaking aspect of the FCC's decision. They don't cure any problems with the first ones. They're perfectly sufficient in and of themselves to do the thing they wanted to do, which was challenge a couple of aspects of this major rule revision. But the early ones were incurably premature. This is nothing like Craker. This is a gun-jumping case like Western Union. And they don't get to institute proceedings for purposes of 2112 by jumping the gun. I haven't answered what caused the venue, but we do have a lot of merits topics. I hope to move on to those unless the court has questions about them. You weren't the ones who raised the venue problem. That's fair. I spent about three minutes on it. I seem to have done more than that. Turning to the matters, there are a number of arguments in our brief, but I'd like to, in light of the FCC's forthcoming order and change of position, I'd just like to focus on three of them. The first is that Section 276B, as amended, imposes two distinct duties on the FCC, one to ensure that all providers are fairly compensated and the other to ensure that all rates are just and reasonable. And yet the FCC treated them as though they were a single duty and as a result ended up not ensuring that all providers are fairly compensated on the FCC's own math. A third of the industry is not. But if you actually do the math the FCC should have done, and when I say that I mean taking all of their decisions as correct but actually putting in all the expenses on the expense they said should be there, you end up with more providers underwater. I don't know why they left them out of the table in Appendix J, but they did. And the FCC in Paragraph 71 of its order says, essentially, as long as people get to charge just rates they will be fairly compensated. That renders the two provisions identical. Yet the D.C. Circuit in G-Town had held that the two provisions are not coterminous the last time the FCC had tried to equate just and reasonable and fairly compensated. And when Congress amended the Act in response to G-Town, and I think everybody agrees that's what Congress was doing, it made lots of changes. It got rid of each and every. It said you can consider all averages. But it didn't change this language. Fairly compensated for what? Fairly compensated for the cost they actually incur in providing the IPCS services. What does that last thing mean, in providing? Because why isn't that used in youthful? Is there a baseline for that? Because if it is, then the language Congress left has no independent meaning. It just means rates. What does it mean on your view? Anything? I think it means the rates. How high are the salaries you charge? Yes. I think that is what it meant as G-Town understood it, and Congress did not change that. Now I'll point out that on the record here, just and reasonable is a zone. It was actually a rather large zone as the FCC defined it. And any rate within that zone is just and reasonable. The FCC could have picked different points in that zone and met both parts of this. Now is it theoretically possible that there could be a provider out there whose costs are so high? Again, for the services that are part of the service, that they are outside the zone of just and reasonable, I suppose it's theoretically possible. I don't think it's going to happen given competition in the marketplace to serve these facilities. But then we would have a situation where Congress gave the FCC two conflicting demands, and the agency, and we're viewing court in the local but world, has to resolve those. But you don't get to say that we just get to pretend that the fair compensation standard has no independent meaning, and that's what the FCC did here. In light of the FCC's new position or evolving new position, what do you want to see us do with this case? So I suspect that it will be – I haven't seen the draft. I've only seen a letter and a press release describing it. I suspect that the order, once it's voted in October, will likely moot some of our challenges. It will likely moot some of the state's challenges. I suspect it will likely moot some of the public interest challenges. It's probably worthwhile to have some supplemental briefing from the parties on what, if any, parts of the challenges still need to be decided now. Frankly, under the same order rule, if this court keeps this case, petitions for review of the next order on reconsideration are going to be treated in the same order. They're all coming here. So it may well make sense to wait and decide everything once this court has full briefing on the challenges to the next order. But I'm speculating because I don't know what they're going to do. Would that potentially argue for us deciding the venue issue independently and first? I think, yes. I mean, I think, frankly, the court should decide the venue issue. I'll note – we've got it in the footnotes. You may have missed it. But through all of the litigation about this, I mean, it's not specific to the general's office. I'll credit them. But there's literally one case anybody's ever found where a transfer motion did get referred to a merits panel, and that court did resolve it ahead of the merits decision. In fact, a week before oral argument and granted the transfer to the Third Circuit. And so I think at a minimum that will not get mooted. And so the court could resolve that question. It probably, as I said, makes sense because it – Otherwise, with everything that's going to come in after that, no one's going to know where it's supposed to come. I suppose that's true, too, Your Honor. So that's 276B. The second error has to do with the ban on – 276B. The way that cashes out – and I may have misread your brief – is that that shows that their treatment of the security costs was wrong? No. That's a separate question. So how does it cash out, if you're right about this, fairly compensated? Sure. It cashes out by helping direct the FCC where within the zone of reasonableness to set any rate caps it sets so that it can pick, if possible, a point that meets both criteria, not just one of them. The reason that you would then seek from that would be a decision about vacates the rule? I mean, what do you want us to do? That's a great point you made. What happens? What should we do with it? So at this point, it's hard for me to say. If there weren't a subsequent – Just forget the subsequent. Then I would ask for a vacater. We revert to the prior 2021 rate caps and the FCC would try again. And when they try again, the guidance to them is what? The guidance to them is, insofar as it's possible, you need FCC to pick a point that's within the zone of reasonableness and that also, when you add up all the allowed expenses and all the projected allowed revenues, means that all providers in the industry are net positive. That's what you need to pick. And again, what counts as allowable on this idea? So that's a different fight, right, John? We have a separate fight about whether it was proper to exclude a whole bunch of safety and security costs. Apart from that, is there anything else that you are saying is allowable that they weren't considering because of the misconception about fairly compensated? No. Does this argument mean anything apart from the fight about safety and security? I think it means as a general matter – But in this case, does it have any practical – Yes, it does, Your Honor, because even if we're wrong and even if the agency adequately explained which safety and security features to include in the rate base, and it said include the cost for telephone relay service for hard of hearing people and include ancillary service costs and a certain cost of capital, that it's got to be the case that when you add up all of those expenses, the revenues exceed them. And that wasn't true on the order itself, and it's even less true if you actually do the math the FCC said it was doing. And so, at a minimum, if we're wrong about everything else here, and I don't think we are, but if we're wrong about everything else here, the rate caps need to be much higher within the zone of reasonableness. So when you do that math, everybody ends up net positive. Even assuming that the other costs are allowably excluded? Yes, Your Honor. I apologize, this gets dense in mapping, and Mr. Berg did all the work here, and I'm going to do my best to recreate it. But the FCC says there are four things it included in the allowable recovery, the actual cost of the services themselves, the allowed safety and security expenses, ancillary service expenses, and the telephone relay service. And that should be the expense column. And yet, when you create Table 3 in Appendix J, where they're doing the revenues versus costs comparison, for inexplicable reasons, they only add up on the expense side of the ledger the actual cost of the services and the allowed safety and security services. They forget the ancillary service costs, they forget the telephone. Anything to do with this legal point about fairly complicated? Absolutely, those are expenses that the FCC says we get to recover through our rates, and yet they set rates that don't let us recover them. So that's a problem, even if we're wrong about everything else. I think they're also wrong insofar as safety and security costs are mandated that we provide them. I don't think they set enough in the order to preempt states from mandating them without also paying them. We think they're arbitrary and capricious in terms of which safety and security categories they included and which ones they excluded. They said they were applying the standard. We don't think that's a proper interpretation of necessary, even if it were. They applied it inconsistently. We've responded to ancillary service charges. They spend seven paragraphs of the order explaining why they're going to stagger the implementation of their rate structure regime, and then say nothing about the third aspect of it, rolling in these raw costs into a permanent rate, and that means that that took effect immediately. There's no explanation in the order. It's in counsel's post hoc explanations, don't get cred under Chenery, and the explanations they gave don't make any sense. These are contract terms. We have to negotiate or renegotiate them, all the same reasons for delay, and nor is there some extra money that we're getting. We negotiated the existing contracts against a backdrop where we had to provide and the rates were going to pay for a whole bunch of safety and security measures that, at least for now, the FCC says the rates don't pay for. But until we amend the contracts, that's what those rates were going to pay for. There wasn't some extra profit center in those rates that's available to cover the costs of ancillary services. And you add to that the FCC's refusal to recognize the basic economic point that when you take a cost away, usage goes up. I mean, when I pay my rent, if I pay for my checking account, I don't get a charge. If I pay for my credit card, I get a charge. If I pay my taxes, I get a break. Any further questions? Thank you.  Thank you, counsel. At this time, would counsel for the states and sheriffs please introduce yourself on the record as you begin. Thank you, Your Honors, and may it please the Court, Kelsey Smith for the states, the sheriffs, and the Louisiana Sheriffs Association. This case concerns telephones. But for the states, our departments of correction, and our individual sheriffs, it is fundamentally about safety and security in correctional facilities, which is an area that we have front-line expertise. Inmate calling is not a two-party consumer market. It is a three-party system that only works if facilities can maintain safety and security. Measures like monitoring, recording, and review, identity, and authentication are not optional. They are the precondition for calling to be made. The order does not properly account for those necessities, and it exceeds the FCC's statutory authority. It bans site commission payments that help fund security, and it excludes the cost of necessary safety and security measures, despite Congress's directive in the MWRA to consider them. The FCC has now effectively conceded error, suspending the rule and declining to defend its analysis on these points. But I differ from my friend in that I think there is no reason to leave an indefensible analysis in place until we would ask this Court to vacate. I'll focus on statutory construction and application, starting with the FCC's inability to ban site commission payments, and then turning to Congress's mandate to consider the safety and security costs. I'd also like to reserve three minutes for rebuttal, if possible. I forgot to add that in. You may. Thank you. Again, the FCC has abandoned its argument that it reasonably determines site commission payments are incompatible with Section 276B and Section 201B. On Friday, the FCC said it will allow site commission bans to take effect in the future, and it might keep the exclusion, but it will seek comment on any proposals. The state maintained that the FCC lacks the statutory authority to prohibit site commission payments, and I'll start with the text of Section 276. Section 276 authorizes three things, establishing a compensation plan that ensures payphone providers are fairly compensated and rates and charges are just and reasonable. It does not, however, authorize the regulation of practices. That remission is meaningful and limits what the commission may do. Contract Section 276 language was Section 201B, which is where the edits to 276 came from. 201B governs interstate and international carriers and expressly authorizes the FCC to regulate practices. Congress knew how to confer practices authority then and chose not to incorporate that standard for 201B into Section 276B. And this matters because site commission payments are practices. They are not rates or charges. Site commission payments are fees that jails and prison facilities charge IPCF providers that are used to fund various programs and aid incarcerated people. Does any of this rule regulating the providers rely on 201 itself? Your Honor, the FCC uses 201 as a backdrop in defense of the regulation of site commission payments, but 201 also does not apply here as a state division.  Because 201B would swallow Section 276 and it makes it very clear the division of the statute that 201B can only apply in this instance if the impossibility doctrine applies and the impossibility doctrine does not apply. Then why wouldn't just ordinary conflict or obstacle preemption apply? Obstacle preemption wouldn't apply because Section 276 is specific to govern IPCF and Section 201B is more general and it governs interstate and international communications in general. And so we should look at the statute that actually concerns IPCF in discussing what is a practice for IPCF. So is that an argument that there's just no authority under 201 that the FCC has as to these providers? Your Honor, that's an argument that 201B does not apply in this situation, yeah. I don't know if I... Are you saying that the FCC has no authority to regulate these providers under 201B? Your Honor, I'm saying the FCC has no authority to regulate practices in the IPCF context under 201B. I'm not sure if there would be other situations... Your Honor, it says practices can be regulated for interstate communications. Yes, Your Honor, but... Notwithstanding that, it's been impliedly repealed by 276? It has not been repealed by 276, but... So the fallback to 201B fails because it would swallow 276 and make it superfluous. And so if we're looking at this in the context as a whole... It has no authority over interstate communications, not intrastate. So the impossibility doctrine, which is what the FCC invokes to say that 201B applies in this context, allows federal regulation of intrastate assets only when it is truly not possible to separate interstate and intrastate. That's an argument that explains why they also can regulate the intrastate, correct? Well, the state's position is that 276 controls here because that is what governs IPCF. What about 201 with respect to interstate? Aren't there some interstate communications that these providers are involved in? There might be, Your Honor. I am not sure. Our point is that for site commission payments specifically, which are third-party payments from the providers to the facility, that is governed by Section 276. And to the extent that 276 doesn't allow it, the FCC's backdrop is that 201B allows it. And our reading of 201B is that it cannot possibly allow that because that would conflict with 276 and make it superfluous in this context. It would make the other 276 meaningless. I'm just trying to say, what is that? Is that an implied repeal argument? Your Honor, I don't think it's an implied repeal argument. 201 on its face either does or does not. Imagine 276 never passed. Could you regulate interstate calls by these providers under 201B? If 276 never passed, I believe you could. So then 276 did pass. So are you saying it's impliedly repealed that pre-existing authority under 201B? I think that has to be the conclusion. Yeah, that 276, because it regulates specifically IPCF, it controls over 201B. And to the extent that there's an argument that 201B would apply, which again, we don't think it does in this context, that it would be... So the usual case is the implied repeal would be if they're irreconcilably in conflict. Why are they? I think because there are other things that 201B applies to. 201B applies outside of this context as well. And so both statutes can be given meaning. And both statutes can have effect. But then 276 was amended to specifically cover IPCF, and then they chose to do that and not give the practices authority and made it clear the practices authority does not apply in that context. And that's even as to interstate communication? Your Honor, interstate and intrastate communications are very easily distinguishable in this context. IPCF providers already are required to differentiate between interstate and intrastate calls. And calls might only be made to... You can't distinguish them when it comes to site commission payments, could you? Your Honor, I didn't think you would be able to, because calls might be made only to recipients on verified lists and communications are tracked and monitored. And that means it's neither infeasible nor impractical to charge site commission payments based on a call's location when we already have that location information. And that's true even if current technology fails to adequately track location, the FCC has not shown that it's sufficiently narrowly tailored to preempt only state regulations that would negate the regulatory goals. And our concern that intrastate commissions might affect intrastate rates also isn't enough because the impossibility doctrine, which again is how the states think and the FCC thinks, 201B applies, says that it has to have inseparability and not just interdependence. Well, is the idea, just so I'm understanding this, the idea you could have a site commission payment that was only for the provision of intrastate calls? Yeah, I think it would depend on what the site commission payment is, but... I'm trying to figure out what do you think it could be that would be able... They're saying there's a commission for providing on the site. That's just going to be a payment, X number of dollars. It's going to be indifferent to whether it's an intrastate call or intrastate call. That's why they're saying 201B would give them the authority to knock those out, right? Well, you're right. Site commission payments are contracts between the third-party providers and the individual facilities. And so the facilities know where the phone calls are coming from and going. And so site commission payments could easily be paid off only for the intrastate calls. And that's why you say that they're just wrong when they say you couldn't disaggregate them. Yes. We already have records of... As long as the site commission thing is structured so that it's a payment just for the intrastate calls and 201B couldn't possibly be the source of authority to preempt it. Yes, Your Honor, that is a much better way of phrasing it than I did. Our view is that 201B is not an independent statutory basis for the order. And finally, the NWRA doesn't authorize the preemption of state laws that do require site commission payments. And that's because an agency may preempt state law only within delegated authority. And our argument is that there is no delegated authority, and so it cannot preempt. I'll turn next to safety and security measures. Before you move on, you touched on this point, but you were saying the authority to set the rates themselves as opposed to the authority to regulate the practices couldn't possibly be enough to justify banning the site commission payments. And the reason is why? The FCC cannot regulate practices by describing them as being incidental to rates. And that's essentially what they're saying, that this is part of the rates and part of the compensation plan. But practices and incidental to rates and compensation plans are not the same thing. And the statutes draw a line between those two. So practices, like site commission payments, are about how providers conduct their business. At the end of that argument, that the dropping of the word practices shows that you couldn't reach something like a site commission, notwithstanding how much it ends up affecting the rate. And I take it the fairly compensated argument that's being run is depending in part on this idea that things that might look like practices do relate to the rate. Do you have any argument about why the FCC would lack the authority to prohibit the site commissions in service of the overall scheme that Congress contemplated of them being able to put limitations on the charges that were being imposed? Well, Your Honor, site commission payments are not about charges. I think that's the fundamental thing that makes, that's why site commission payments are not covered by 276. Compensation plans and rates and charges typically are things like the amounts that are paid and how you get paid. And compensation plans concern things like the timing of the payments and burden requirements. Whereas site commission payments are things that happen before a provider is even paid. It has nothing to do with the rates that are set. It is on top of the rates that are set, in addition to, but it is not itself a rate. And I don't think anyone really contests the fact that a site commission payment is not a rate. Does that answer your question? Okay. I'll turn next to safety and security measures. Again, the FCC has abandoned its arguments regarding the necessary safety and security measures. On Friday, it announced that the agency will change its approach, and it will now consider all seven of the categories. Accounting for the cost of all necessary safety and security measures necessary for providing IPCS accords with the statute's mandate. And the FCC's previous failure to do so exceeded its statutory authority, and is why the order must be vacated. The statutory text has a mandate. It says, Congress issued a targeted and mandatory instruction that said, when setting the IPCS rate cap, the commission shall consider costs associated with any safety and security measure necessary to providing IPCS. If the FCC refused to define or decide what even counts as necessary, instead it substituted it with the use and useful framework that's key to whether a cost benefits an inmate and their families. And that violates the statutory directive to consider all necessary costs. When Congress explicitly enumerates safety and security measures as an important and mandatory consideration, distinct and apart from other costs, the agency then has to consider that. They cannot just say it, consider it, take a path, and consider something similar. It elsewhere has the concept, I think, in the statute, of security costs that are just related as opposed to necessary to. Yes. So on your view, what is the distinction between a related security cost and a necessary one? I think the statutory language makes it clear that, and I think this is what you're getting at, that Congress enumerated the FCC to not only consider the safety and security costs, but also all costs associated with those. And I think what that shows is that the commission had to actually consider all of these costs, but they didn't even do that. There's three paragraphs that say we don't have to explain our consideration. What is your standard for understanding, since there seems to be a distinction between a security cost that's just related to the provision of service and a security cost that's necessary to provide the service? Yes. What is your understanding of what that distinction is? Our understanding is that because IPCS is a different context, the question has to be, you have to look at what is necessary within the context of the act altogether. And so asking whether it benefits the user inmate does not adequately accomplish what necessary means. Necessary means it has to be required for the provision of IPCS. And there's a dispute in the record. Platonically, what's our baseline for figuring out, since there's a separate thing where the statute seems to contemplate things that are merely related? I think the seven categories of safety and security measures are a good place to start. And I think the commission would go through and look at all the evidence and determine what is necessary. What is the criterion? If it's not used and useful, what is the criterion? The criterion is whether, I mean, from our point of view, the criterion is whether IPCS can be provided in facilities absent that safety and security measure. It can be. It can be in what sense? Like physically, could it be? Well, if the state and the sheriffs and the individual facilities would not be able to provide IPCS. Not be able to, what, physically, empirically couldn't? Or because state law, is it just a state law mandate point? I don't think it's a state law mandate point. I think it is a point that focuses on the facilities and the needs that they require. And so things like – Whatever they say they need is enough? I think whatever they say they need that's demonstrated in the record and has reliable evidence, the commission has to consider those. I don't think that the language of the statute says the commission has to adopt every single safety and security measure. It has to reasonably analyze them, though, and that's the failure here. The commission didn't do that. It just said we do not need to rely on what is necessary. It didn't engage in this conversation that we are having of what is necessary, what does it mean to be necessary to provide IPCS. And I think a good starting point is whether you're able to provide it in a facility. And if there's overwhelming evidence in the record, as there is, that removing monitoring features would lead to IPCS not being provided, then that is necessary for the provision. And so I think they failed to comply with their statutory mandate to engage in this analysis. And, again, it's also arbitrary and capricious because they failed to engage in this analysis and look through it. I think there's a chance that it's cured with this new rule, but as it stands right now, they did not go through with this, and so the order needs to be vacated. And then with my remaining time, I will quickly touch on an independent reason why the order must be vacated, and that's because the FCC structure violates Article II of the Constitution. Article II, that's the power in the President, and that grant necessarily includes the ability to supervise and when necessary remove those who exercise power on the President's behalf. The FCC unquestionably wields executive power, but they have an independent agency who has members that serve a fixed term and not removable at will by the President, and because of that their structure violates Article II. So unless this Court has any other questions, I'm happy to seize the rest of my time and ask that you vacate the order. Thank you. Thanks. Thank you, Counsel. At this time would Counsel for the direct action for rights and equality, and I'll please introduce myself on the record to begin. Good morning, Your Honors. May it please the Court, I'm Jermaine Lamberti on behalf of the Public Interest Petitioners. I'd like to reserve one minute for rebuttal. For decades, incarcerated people and their loved ones have paid egregiously high rates for communication services despite widespread recognition that affordable calling rates benefit incarcerated people and their loved ones, facilitate successful reentry, and improve the safety of correctional facilities. They have done so because IPCS providers exploit the monopolies they enjoy over the facilities they serve to charge rates and fees that far exceed their cost of providing service. In addition, many correctional authorities You don't have much time. Yes. I'm happy to skip to what I want to focus on. Yes. So I'd like to focus on venue first and then the safety and security costs. So we'll start with venue. It's a confusing issue, but I think there are several confessions this morning that help simplify the issue for the Court. The first is there's no question that this Court has jurisdiction over our petitions. We filed a supplemental petition as the D.C. Circuit has encouraged, and there's no question, I think, my friends, accepted that there's jurisdiction in this Court. Then there's a separate question of whether venue is proper. And as Chief Judge Barron, as you said, we think that the way this Court needs to analyze that question is under the discretionary standard 21-12-A-5. There's no other choice of authority that questions whether the JPML correctly ran a lottery, whether positions were sent to the letter. As your opponent said, there's got to be some way to challenge an erroneous decision. I mean, I don't know. Maybe there doesn't have to be a way. But what, in your understanding, is the way to challenge an erroneous decision to conduct a lottery? So two answers. One is we're not sure if there necessarily has to be a way. We think the history of the 21-12 statute is clear that it wanted a very mechanical process to get all the petitions consolidated in one Court. This Court's testing is consistent with our understanding that a Bayside case and the BASF case both make clear it's a mechanical rule. So all the petitions get consolidated in one Court. Then the question for that Court is whether, in its discretion, it should transfer. And so it's a problem. Yes. Yes. Just on that first one. Yes. If something went wrong there. Yes. Your answer is that's just the way, that's the end of the story. Yes. The point of the statute is to avoid all sorts of questions about how do we get things into one Court and leave it on the back end for the back end Court to solve that problem. Now, on the back end question, you could imagine arguments that for the communes or the parties in the interest of justice, which is the 21-12A5 standard, you could look into improprieties in the lottery process. But we think that would be the question for the Court, and we don't think that is satisfied here for reasons I'm happy to explain. Yes. One is that for the communes or the parties, the parties have not briefed this case for over a year in this Court under First Circuit precedent. This Court has considered motions to transfer already. We're all here now, and so we're not certain the communes or the parties in any sense have not transferred this case to the Fifth Circuit. With respect to the interest of justice, we think similarly, the effect of the providers arguing it by challenging the very small tranche of the publication on August 20th is that it deprives everybody else of their statutory right to the lottery that 21-12 entitles us to. We're perfectly entitled to challenge this order in our own circuits. That's what the Hobbs Act provides. And the effect of the Sixth Circuit... On that second point, how good a point is that given what your opponent said, which is that's just the statute contemplates that if you're not aggrieved by something, then the people that are aggrieved by it challenge it, and the rules that apply to that aggrieved party's filing determine what court gets it. Why should you be able to jump in and short-circuit all that by challenging something you're not aggrieved by? What's your answer to that? Well, we think this is an unusual situation where this isn't a situation where you have two different orders that are somehow unrelated, that are deemed the same order under the purposes of 21-12. It's literally the same order. It's one document. It's published on July 22nd as one document. The portions that he's challenging are six paragraphs toward the end of that order. And so, in that situation, there's genuine ambiguity on our part. We were there. It was ambiguous what they were challenging and whether our right to a lottery was being triggered by this initial publication versus the later publication. And on the ambiguity point, the one response to that from your point, if I understood it, was you conceded it wasn't ambiguous because you kept saying we're not aggrieved by these parts of it. So, what's your answer to that? We think that's sort of taking our effort to be transparent with the court and not holding it against us. We're saying we're not sure under 21-12 if this is going to be considered the same order or not. That's genuinely ambiguous. They've attached the entire order. In certain places, they reference the entire order. We're not sure. We have our statutory right to a lottery. And so, just in case, we're filing these petitions. We're not trying to hide the ball. We're not trying to do anything that would go aggrieved by this portion. We've supplemented our petition to make clear that this court has jurisdiction. And so, in those circumstances, we're filing to ensure that our statutory right is protected. That is not the typical case. There are not a lot of cases sort of like that. And so, we don't think by, particularly at this stage in the litigation, concluding that we're not sort of to convene to the parties, to retain venue here, we sort of explode the way the scheme is supposed to work. This is a very unusual situation. The SEC itself in their briefs notes that this was sort of by happenstance that the Federal Register published it this way. It's not sort of like running a truck through this statute in any way. It's a very particular exception that we think would apply here based on where we are in the litigation. We've offered a coherent understanding of the statute that allows for the court to correct certain errors in situations where there's sort of gun jumping, but that's not the situation that we have here. So, again, I'm happy to talk about the particular things that they've offered. I don't think that's necessary for the reason that I've just given, which is that the discretionary standard would apply. And so, sort of in your discretion, for the reasons I've given, you can retain venue. And I'd like to turn to the safety and security costs issue now. So... Yes. Back up one step. I could see a problem with the court taking... receiving an argument for a transfer. And I don't know how this usually works with these transfer arguments. Having all the briefing and then saying, well, now that we've briefed it all, why would we transfer? It's a waste of everybody's time. But I take it that's not your full argument. Is there some reason, out of fairness to the parties, why, independent of the fact that it's now been briefed here, it wouldn't be wise for a court in a situation like we faced to transfer the decision? Do you follow what I'm saying? Yes. Yeah, so I think there are some. One is, I think the court, as part of its analysis and its discretion, could look at the six-page sort of ancillary issue that was at issue with the initial publication relative to the broader set of issues that have been raised and consume the vast majority of the briefing here with respect to the subsequent publication. And so, you can ask the question, sort of, did that small publication control the rest of the litigation? And, again, we think that provides a unique reason here why you could conclude, sort of, given that everyone else has a statutory right to a lottery, that right would be deprived if we let the small publication control. We're not going to find it in the convenience of the parties. But I think it's a totally distinct rationale that would also justify our venue in this court at this point. On safety and security costs, I think, again, we're raising the points that I would like to make and that we've raised in our argument, which is, one, we think the statute is very clear that it's really trying to cabin the safety and security costs that can be recovered in the rate. This is in a context where rates have been high for a very long time. Congress adds the language of just and reasonable into the statute. Just and reasonable brings with it the use and use for framework that focuses the agency on prudent costs that are necessary to provide a particular service. And then Section 4 of the Act further confirms that necessary to provide is the standard. So in our view, necessary to provide is in the nature of technically necessary to provide the service. Could I call you without the safety and security costs being included? It's not whatever the sheriff's say needs to be included or anything broader than that. It's just, technically, is it necessary for the provider to include this feature in order for the service to be provided? And it's a very narrow standard. At the same time, Congress may clear in Section 4 that broader safety and security measures that are related to safety and security can still be provided. It's just those can't be passed on in the rates that incarcerated people and their loved ones have to pay. So, you know, we think it's notable that the states have asserted all of these costs, but the question is what do incarcerated people need to pay? And there, Congress made clear that only very narrow category of safety and security costs should have been included. So in our view, the commission correctly excluded in the order under review five of the seven categories. We think it should have also included a sixth category that under that standard, if you think was correct, it misapplied. But given that the commission is sort of revising its approach, I don't know how much I need to get into that particular issue. The point for us and the thing the court needs to clarify in this decision here is what the standard is. And we think it's very important for the court to make clear that the statutory standard necessary to provide both incorporates the user-useful framework and is meant to limit the safety and security costs that can be recovered and delivered to where it's technically necessary to provide the service, not some broader understanding of necessary that has been asserted by some of the other parties here. What's the logic in that if one of the things that were in practical effect and everybody knew it in Congress is that this is a particular type of caller calling from a particular type of facility. And so what's technically necessary to permit me to call from my house might not fully capture what's necessary to permit a prisoner to call from the prison. Yes, so we think the commission did acknowledge that there's a difference in setting. In that score, they wanted to make sure that they're just not going to give you a phone to call if what you're calling is to commit a crime. That's not going to happen. Yes, so we're not contesting, we're not saying that there's no such cost. Technically necessary to have that cost of whatever it would do to monitor third-party calls or conference calls or all those type of things that you might not need those in an ordinary call setting, but you might in this setting. I'm using technically necessary as a shorthand in this context for what is required for the calls to be provided. So technically necessary could include, for example, providing PINs to incarcerated people, ensuring certain kinds of fraud management for incarcerated people. Once you go that far, you don't need that to make a phone call. You only need it if you think there is a security need for it in this setting. You need it to make a phone call in this setting. Okay, but that's because of the security risks of this caller. Yes, so the universe we're talking about is the universe of safety and security costs. We're not saying that there are, we're not talking about what general need to make a phone call. What is the line you're viewing that helps me decide when it's necessary and when it's not if the sheriff says this is necessary too in this setting? The line is, is it necessary for an incarcerated person to make a phone call? Would it be technically necessary for that to be provided? So an example that normally is contested is these CALEA costs that are associated with a federal statute that requires carriers to ensure certain confirmation is tracked so that the government can collect it. That normally is contested because in order to make a call in this setting, it's required for that cost. If the state says you have to record the call and transcribe it under state law, then it's required to do that to make the call. But you're saying that doesn't count, right? Yes, we're saying... So what's the difference? Well, the difference is, we're using these for standard. There's really, the commission runs these together and they're consistent, but there are two different aspects. Using these for standard says you can only collect costs and pass them on in rates for things that are to the benefit of the rate payer. And then you have the technically necessary, necessary to provide language in the statute that Congress enacted. So there may be lots of things that states would like to have, like being able to create customized reports, to store data in certain databases, that sort of thing. And as the commission explained, those things aren't included under the Use a Useful Framework because those don't benefit the rate payer. Those are serving other functions. But what about cost? They don't benefit the rate payer. They don't benefit the rate payer, but they're necessary in the sense of you can't be a carrier. So that's why I'm saying... You can't do it unless the state says do this, right? So I just am trying... What's your answer to that? Well, I think the answer is there's two distinct inquiries that are related. One is, is it benefiting the rate payer? And if not... It basically applies to all callers? Yes. Yes. Career is just a general requirement. That's all providers. That's right, Your Honor. I see that my time has expired, so I'm happy to stop there. I'll be back shortly. Thank you, counsel. At this time, would counsel for the FCC please introduce himself on the record to begin? Thank you, Your Honor. May it please the court, Bradley Craig-Meyer for the respondents. I want to quickly start by calling the court's attention to a letter we filed last Friday that's been mentioned a couple of times. The letter explains that the FCC chairman circulated a draft order that, if adopted, will supersede significant portions of the order under review, and that the FCC chairman  will be able to review and move those corresponding issues in this litigation. And I think that goes to a question that we heard earlier about what should the court do. Before you get into that, the letter also says that order becomes public today. Is it public now? When we came into the courtroom, it was not yet public. I suspect it will be public sometime this afternoon, and we'll update everyone probably after we get back from the argument. But as far as I know, last night I heard early this morning the plan was still today. Thank you. I do think that counsel is in favor of the court, at a minimum, pressing pause and waiting for the commission to take that action, to vote on that order, and then to potentially hear from the parties, whether through a motion to govern or something similar, about how exactly to proceed once we sort of know exactly what the state of play will be. Is that true with respect to the venue transfer questions also? I don't think the order will mute the venue issues. If the court is looking for something to parcel off and decide in the meantime, if the new order comes out, and what's the next stage? When it's going to be announced publicly, and then when would it become subject to a petition? How far are we from the point in time in which someone could file a petition challenging it? So after it's announced publicly, the next step is the commission will take it up at its meeting. In October, it's monthly meetings. That meeting is currently scheduled for October 28th. Okay, they take it up 28th, and then what happens at that meeting? Who knows? Assuming it's adopted, which at least based on my personal experience since I joined the agency, that's typically what happens when the commission considers an order. It adopts it. After that happens, this would be a rulemaking document that would be subject to Federal Register publication. So we would send it to the Federal Register for publication. Once it's published, that would then start the clock for judicial review. So as of November, let's say, on this time frame, as of early November, new petitions would start coming in? Yeah, I think that's likely. The thing that's in my mind is whoever's filing those new petitions has some interest in knowing should they be filing them to us or to some other court if we've transferred it to another court? I do think that's an issue or no big deal. They could file them to us. We just transfer it then if we were going to. I think this could play out in the ordinary lottery process, Your Honor. If there are new challenges to the order, I think it's possible that those, assuming the lottery, would just go to a new lottery process, those petitions. I think it was in reference to the same case doctrine. I don't know what that is. Yeah, I think that was a reference to the same order doctrine. It wouldn't be? I see. Yeah, I think it may well depend, but I can imagine a scenario where if the agency gets two or more petitions within the 10-day window from different circuits that triggers the lottery, the agency would then send them to the panel. It's possible the panel would decide to send them here. Let's say the new order comes out and it supersedes parts of this, but not all of it. So let's say it supersedes it on security costs, takes a new approach to that, leaves unaddressed the current thing preempting site commissions. Does that mean the site commission issue would be in this court and potentially the security cost question would then be resolved by the lottery winner circuit as to the new order? Yeah, I think it would really just depend on the set of issues. The issues that would be moot I think would just fall out. The issues that are live, it could be the case that those would stay here But the issue of security costs isn't going to be fully mooted out because you've got people on both sides who are unhappy with it. I think some people would be unhappy with the new order just like some people are unhappy with the old order when it comes to security costs. So the petitions about that in theory would then be, on this view, could be subject to a new lottery for the circuit to handle that new portion of the order while the remaining portions of this order would remain in this court for us to decide because we were the lottery winner from that. So security costs I think is a great example, Your Honor, of why I said I think it really depends. And so you are absolutely correct that we have challenges on both sides. You shouldn't have included. You should have included. I think security costs in particular is an example where that whole issue, assuming the order is adopted as proposed, will be moot because the agency is planning to make a different decision and it will be based on a different record. So then, I'll be happy with it. Even if they're not happy with it, I take it. The legal issues, I'm just saying that the challenges to that order, and maybe this is just not a big deal, but there would be a challenge to that order dealing with security costs. Meanwhile, the site commission's issue would remain here as would the fairly compensated. In other words, you could just have, it doesn't seem like a great setup, so I'm just trying to. I do think there, if you have any thoughts about are you worried about that? What would you recommend to us? I agree there are some issues that more cleanly will not likely be affected by the new order, but I guess I would sort of go back to where I started, which is I think that's all a reason to press pause at least momentarily to see what exactly happens and then to give the parties a chance to brief something similar to a motion to govern. I think that would be true also as to the venue question, I guess is what I'm really asking. Yeah, I think a venue, the venue issue could be addressed in the party's later filings when everyone has a chance to evaluate. Would you recommend that? In other words, your view about discretionary transfer might depend on what happens after we see the new rule. I agree it would be appropriate to hold off venue and vision to everything else until the commission has adopted, voted on the forthcoming order. I would like to spend just a little bit of time on the statute, and for the most part, I can't get into the specific application of the methodology, the used and useful framework here, but I do think it's important to mention three general points. The first point is the used and useful framework is at least facially consistent with the dual requirements under Section 276 for the commission to establish a plan that ensures just and reasonable rates and fair compensation. I guess the context here is just and reasonable is relatively new to Section 276. It's not, however, new to the Communications Act and the agency itself. For decades, the commission has implemented Section 201B, which requires rates associated with interstate calls to be just and reasonable. The commission correctly and reasonably concluded that Congress imported that same framework here, and I think the used and useful framework is really well-suited to balance these interdependent duties. There are sort of three steps to used and useful. The first step, the commission recognizes that these property owners, the providers, have an interest in being compensated for their prudently incurred investments and costs that they incur when they offer service. Step number two recognizes that the consumers should only be required to pay for investments and costs that benefit them in some way, and then step number three asks if those costs were prudently incurred. At this point, if I follow Securitas' argument, there is a list of costs to the providers that the commission treats as allowable to be considered in setting the rate. There's four on his table. There were four. And then the contention is notwithstanding that, they set a rate that would place some people underwater by not, and that, no matter what else fair compensation means, it has to mean that you have to fairly compensate them for all the costs that you think are allowable in setting the just and reasonable rate. What's your answer to that? Is that how you understood what the argument was? I think I follow your honor, and without getting into the specifics of those costs, I guess I would make a couple of points. That sounds an awful lot to me like a profit guarantee, which I think, at least in a couple of places in the brief, that is how I read the argument from the providers as to what fair compensation requires. They read it as a profit guarantee. I don't think there's any way to square that argument with what Congress said in the Martha Wright Read Act, where it expressly allowed the agency to implement the statute using industry-wide averages. That necessarily means that there will be some providers who are above average, and it may well be the case that if they have costs that are extremely high, not prudently incurred, they will be unable to recover all of those costs. I think the argument that every provider must be profitable seriously risks subverting the just and reasonable requirement that, again, the agency has to balance both of these at times competing interests. Let's say that we're right, what you just said. Take the example in which the commission says, here's what are allowable costs and here's what are not allowable costs when we set the rate, and we list four items. When we then go to set the rate, the contention is they set the rate by not considering two sets of costs. That's not an industry-wide average point. In setting the rate, they just didn't consider two things that went into the cost side, even though the commission acknowledges they should go into the cost side. Do you have a response to that? Did that just not happen in your view? Is that something that's permissible to happen, notwithstanding the fairly compensated language? I'm afraid that gets a little too much into the specific application of what costs the commission included, so I can't get into the specifics of it. As we reiterated in the Friday letter, the commission has abandoned the parts of the rate that address safety and security costs, facility costs. In theory, you would acknowledge that the fairly compensated language means that the just and reasonable rate has to be set by accounting for all the allowable costs, which is a different point than the rate having to be set at a level that ensures a profit for every provider. I agree with that, Your Honor. I think I would just point the court to paragraph 219, which is at JA1607, which says that we find that a provider will be fairly compensated if it has afforded an opportunity to recover the industry average of its prudently incurred investments and expenses that are used and useful on a company-wide basis. That language, in effect, is saying all of the costs that we think are relevant to used and useful are being accounted for. On a company-wide basis, using industry-wide averages. I think that's right. I guess a couple of other points about the statute. One, the first one I mentioned, I think used and useful at a minimum usually satisfies both of those requirements. Number two is the one we were just talking about. I do not think the statute guarantees profit for every provider. Number three is that the used and useful framework at least facially satisfies the Commission's obligation to consider the costs associated with safety and security measures that are necessary to providing service. Again, I would point the court there to footnote 1320, which is at J.A. 1680, and then describing the second step of the used and useful framework. The Commission says, in this regard, the Commission considers whether the expense was necessary to the provision of the services subject to the just and reasonable standard. I think it's, again, difficult to square the argument that the Commission, that used and useful does not satisfy the obligation, which is only to consider those costs. It's not to include those costs. That is a decision ultimately to the Commission, which I think feeds into a separate point. The statute, at the end of the day, charges the agency with making these decisions. Some of the arguments sounded a lot like the facilities should be the decision maker in deciding what is necessary and what is not. Again, the statute, I think, leaves that decision to the Commission and, at least facially, used and useful as it weeds out costs that are not recoverable, facially satisfies the statutory obligation to consider the necessary costs. Unless there are other questions about the statute... Thank you, Mr. Issue. So that, Your Honor, is an issue that we've abandoned, and so I'm unable to... Even though the Order isn't addressing that issue, or the Order is addressing that issue. So the letter we filed on Friday mentioned that the draft, as currently proposed, will allow site commissions to... I don't understand that. You're still abandoning your defense of the existing... That's correct. We've still abandoned that issue. The letter mentioned... Allow site commissions to be charged? The new Order will allow... Will allow the ban to go into effect, but then the Order, as proposed, is also seeking comment on whether to retain that ban. So, to some extent, that is still a live issue, and we've abandoned... The comment-seeking process, how is that going to affect the timeline for when that Order would be subject to being petitioned? I don't think it would affect the ability to challenge the ban itself, because it, under the Order as proposed, would go into effect. I'm just saying, there's this Order, and then you were telling us end of October, commission votes on the Order, and then it would go to publication, so November would be all done. But if you're contemplating a comment process on... Is that a comment process in relationship to the proposed Order that's going to be voted on? It would be... I think two things could be true at the same time, assuming the Order is adopted as proposed. The site commission ban could go into effect, number one. Number two, the commission could still be seeking comment on a forward-looking, permanent basis whether to retain that ban. So I don't think that's necessarily unusual, that there's a rule on the books that's in effect while an agency is seeking comment on how it wants to address that moving forward. But you're not defending the attacks on the site commission ban? That's correct, Your Honor. Even though you're going to keep it in place? That's correct, Your Honor. And we have ceded time to our supporting interveners. Even though we've abandoned that part of our brief, I think it is within the Court's discretion to decide how it wants to treat those arguments in our brief. I think the Court would still have the discretion to consider those arguments. And then, of course, the Court could always look to the Order itself. When you say the new Order, you gave us a time estimate it would be sent to the Federal Registry for publication sometime in, say, November. That's with the ban on the site commissions in place. So right now, the ban on site commissions has been... The compliance has been stayed until April 2027 or an earlier date that the commission sets. And as currently proposed, the Order that the commission will take up later this month will set an earlier date, a date earlier than April 2027. For? For the ban on site commissions. I'm sorry. No, excuse me. For the ban in the 2024 Order that's before the Court here, that ban has not yet gone fully into effect. As proposed, the Order would set a date by which the ban would be fully in effect. And it would also seek comment on whether it should keep that ban moving forward. A couple of quick points. Can I just ask one? I just want to make sure I understand one thing. So if the ban is not being defended by the commission and we were to rule that the ban is no more, what would be left for the commission to do in terms of considering whether to keep the ban in place or do something else? I think it would probably depend, Your Honor, on what exactly the Court's theory for why the ban was unlawful. Like I can imagine different avenues for doing so, like a statutory authority decision would be different from, say, an arbitrary and capricious failure to explain theory. You don't want to defend your statutory authority to impose the ban. So we have still abandoned that argument, Your Honor. I guess just zooming way out, the adversarial process, I do think, is still preserved here. We have interveners, again, who we've ceded time to. The arguments in our brief, I believe the Court has the discretion to consider if it's a… It's an unusual thing that the commission won't defend the scope of its own authority. So this litigation has… That's a very good point. I've just never heard such a thing, but maybe I'm… Well, I guess the… It's up to the intervener to decide whether the FCC has authority to do something. The only thing I would mention is a point we raised in the letter, which is that the commission is still planning to seek comment on this issue. You're leaving it in place? That's correct, Your Honor. So you want to leave it in place that regulates the public. Based on a statutory argument, you won't defend whether you have the statutory authority to do it. I know this may be not your call, but it is… I'd say unusual. I understand, Your Honor. I guess just to one more time go back to it, I do believe the adversarial process has been preserved here. The arguments are in our brief. If the Court wants to consider those, it has the discretion to do so. Otherwise, the Court, of course, is free to ask our supporting interveners about that issue as well. I'll turn to ancillary service charges unless there are other questions about the statute. Just very briefly, there was a challenge to the commission's decision to use the default rule in deciding when the ban on separate ancillary service charges should go into effect. I think that's a failure to explain challenge, and the bar there is relatively low for the commission. It simply has to show that its path can be reasonably discerned. I would point the Court to paragraph 595 of the order, which is JA 1793. It says, unlike our rate cap and site commission reforms, which may take longer to implement due to the need for contractual amendments or municipal budget adjustments, we do not view these other reforms as involving similar complexities such that a longer effective date period is necessary. That refers back to over three pages of discussion about why it is that the rates in the ban on site commissions are unique and the complexities that come with those changes. That paragraph then makes clear that the ban on ancillary service charges and all of the other changes to the rules lack those unique features such that the default 60-day after-publication rule would be in effect. I think that the path is reasonably discernible there, even if the commission didn't use the magic words of specifically spelling out ancillary service charges. I think in speaking, won't all the contracts still be affected? I don't think the providers have pointed to anything in the record that suggests, even if ancillary service charges are addressed in contracts, that they are contractual terms similar to the rate caps or site commissions. So we mentioned that there's an affirmative obligation to, say, offer certain ancillary service charges at certain prices. I think they say that the contracts deal with those, address those issues. All it has to do is be a material term to the contract and affect the material term of the contract. Is there reason to think it wouldn't? I can imagine a situation where a contract says, and again I don't think that the record gets into this, but I can imagine a situation where a contract says, if you are going to charge separately for ancillary service charges, here's the rate at which you can do so. I think that's similar to some of the state laws that the interveners point to in their brief. They point to state laws that they say, I think, carefully govern ancillary service charges. They don't say that any state law necessarily mandates specific charges, specific services at specific charges. But I think, again, zooming out, the providers haven't pointed to anything in the record that's inconsistent with the commission's conclusion there. And given the relatively low burden of simply a path that's reasonably discernible, I think when you compare the three-and-a-half pages of what exactly is unique about the rates themselves and the site commissions and then contrasting everything else with that, the path is reasonably discernible. I see I'm just about to run out of time. Can I take you back and ask you a question about something that you brought up much earlier in your argument? In the IPCS world, just and reasonable has not previously been the standard that you have applied. And you talked about how you have to sort of resolve the tension between fair compensation and just and reasonable and do some balancing. But you also said that, generally speaking, and I know this is true in the state, so I assume it's also true with the FCC, that just and reasonable is sort of this overarching sort of principle that gets applied. Is there a feature to that that you can just sort of either point me to a case or explain to me whether one trumps the other if there's a true tension between, for example, just and reasonable and fair compensation? Or are they always reconcilable? I would mention a couple of things, Your Honor. One is the commission said in the order under review here that it cannot subvert one interest over the other. So I think that responds to the question, you know, does one trump the other? And so I think the commission's order is best read there as no. The second point is the commission mentioned, you know, in its view there's no one specific rate that would satisfy either the fair compensation requirement or the just and reasonable rate requirement. There's a zone that would satisfy both. And given, you know, the discretion that the statute I think is best read as a just and reasonableness approach, the commission explained in its view that part of those zones would overlap. And I think that is an important thing to keep in mind here. And I think as we heard earlier from the Provider's Council, although their briefs kind of read like a broadside attack on the use and useful framework, what I heard here today is it sounds like they just think the rates within the zone needed to be moved up. And that sounds, you know, again, like this kind of high-water mark of agency discretion, but I think the more important analytical point is that used and useful is at least facially consistent with the statute in those three points that I mentioned earlier. I see I'm out of time. Just following on that same point, and I'm not sure you did answer this if you didn't answer it, suppose I had a statute that said used and useful is the standard you have to apply in setting the rate, okay? And then they amend the statute to say and also ensure fair compensation. What would be the effect in your view of the amendment? I think it would be an explicit mandate to make sure that the methodology the agency implemented in this hypothetical statute accounts both for rates that consumers will pay and compensation to providers. I think you say this in the brief at one point, or maybe it's the intervener, but the idea is that redundancy is not the same as superfluousness. So am I right in reading you to say that the inclusion of both these phrases may be redundant, but that doesn't mean they're not being given effect? I think that is fair to say, especially given the interest the used and useful framework balances, unless the Court has other questions. You have one. With respect to those matters that you are abandoning, is it fair to say that what you really mean is the Commission is not taking a position on those, or are you conceding that the Commission's arguments are inadequate? We are not conceding that the Commission's arguments are inadequate. That's consistent with your saying there are other parties who can handle this, but it was just the language choice that I was having some trouble with. We're not going to defend. I think your Honor is correct that we are simply, at this time, not taking a position on those issues. Thank you. Thank you, Counsel. At this time, would Counsel for Respondents, direct action for rights and equality, please introduce yourself on the record. Hello, Your Honor. Arjun Ramamurti on behalf of the Public Interest Intervenors. So I'd like to begin first with clarifying our position on how the Court should proceed in terms of next steps. I don't think we've expressed a view on that yet. So we agree that supplemental briefing would make sense at the point where any order is actually adopted by the Commission. Our view is that what we have now is a press release and a blog post summarizing a potential order. Apparently there will be a draft later today. That draft hasn't been reviewed by the other Commissioners, and it may or may not be adopted at the October meeting. So in our view, there's more uncertainty as to how exactly the next steps will unfold, but assuming that some order is adopted at the October meeting, it would make sense at that time for the Court to request supplemental briefing from the parties as to any issues that may have been mooted as a result of that action. Do you think that's true? It sounded like the FCC was of the view that it would also make sense to hold off on figuring the venue issue until that point. So we don't think that would really have any bearing on the venue determination, but we also don't think that the Court needs to separately decide the venue question at all. We cite this U.S. Telecom case. Well, I guess I meant the discretionary transfer issue, because it might bear on the discretionary transfer question if we suddenly got two orders with different parts of the case, right? It could bear on it, but if the providers have said, for example, that they think under the same order rule all the cases would then appear, the Commission has said there may be another lottery, we think that sort of immaterial view would be that if there is another lottery, there would be a strong argument for transfer to this Court under the same order rule. This Court has determined the same order principle by looking at whether it's an order in the same proceeding, and so we think under that rule, this is obviously an order in the same docket number in the FCC, and we would have other arguments why transfer would be appropriate. So we don't think you have to wait to decide transfer is the short answer. We think even if you did wait, however, there would be arguments as to why transfer to this Court would be appropriate if the case is still pending in this Court at that time. And the last point is, as the Commission counsel admitted, there are certain aspects, and this one will be the site commission issue, where the Commission is not changing its position but is seeking further comment as part of the order that it's issuing. So our view is that the mere fact that they're seeking comment on that issue does not have any effect on whether this Court can decide the site commission issue. That's still teed up for this Court, and seeking further comment will not affect the ability of this Court to review that issue. And I'd like to start with the site commission issue. So I agree that it's somewhat unusual for the Commission to both not change its view on site commissions and what it's planning to do, but also not defend its position. That said, we think that the order adequately explains both the basis of the statutory authority and why getting rid of the site commissions was not arbitrary and capricious. So beginning with statutory authority, our view is that the site commission ban is actually compelled both by 276B1A and under Section 201, as the Chief Judge noted. I'd like to start with 276B1A. Under 276B1A, the Commission's reasoning is actually that it's impossible to reconcile the dual mandates of just and reasonable rates and fair compensation if site commissions still exist. And I point the Commission to paragraph 269 of the order, JA1631, where the Commission says site commissions are fundamentally incompatible with our mandate under 276B1A to ensure both just and reasonable IPCS rates and charges for IPCS consumers and providers, as well as fair compensation for IPCS providers. So the Commission's view is that because site commissions have this inflationary effect on rates, there's no way to ensure both just and reasonable rates and fair compensation if site commissions still exist. Why aren't they doing the same thing with respect to unnecessary security costs? Well, unnecessary security costs, we think that there's a separate statutory standard that governs that particular issue. With respect to the fair compensation, you're not saying that the unnecessary security costs are preempted. They have not said that here. And they do not think that fair compensation requires their preemption. So why does fair compensation require the preemption of site commissions? So the reason is that these are payments that go from the provider to the facility. They increase the rate because these payments are made. So there's a non-necessary security cost. Yes, but there is one explanation for that in the order, which is that the Commission redefines site commissions to exclude the used and useful costs that the facility incurs. For those, a particular cost provider is still permitted to make those payments, and so they square that circle by saying if the facility can show that it's incurring certain safety and security measures that are, in fact, used and useful. For the ones that aren't. For the ones that aren't. Yes, for the ones that aren't. Totally not used and useful. Yes. And also have an inflationary effect. Correct. So for those, one set, fair compensation doesn't require them to be accounted for. The other set, fair compensation does require them to be. No, so the Commission has said that with respect to income payments, which would include unnecessary safety and security measures, those are preempted. Those are preempted. The Commission's brief takes that position, and so they would consider that to be a site commission, and so it would be preempted. Site commissions are not just the monetary payment, but also in-kind payments, any sort of in-kind services, anything that the provider is providing to the facility. There are some security costs that are not necessary, correct? Correct. That are also not site commission payments. There are some security costs that are not necessary, but also not site commission payments. Yes, that's correct. And those are not counted for setting the rate, correct? Those categories are included in the rate that is recovered by the provider, and the provider is allowed to reimburse for those costs to the facility. That's how that category is dealt with in the order. The non-necessary ones? The used and useful ones. There is a category of security costs. Am I wrong about this? Category of security costs that are not preempted, that are not included in the used and useful framework, correct? Yes. And those are incurred by the provider, and the rate doesn't account for them in setting it, correct? No. Well, the rate that the commission is setting, keep in mind that that is a cost that the provider has to incur. Well, after the order, the provider is not, they're not recovering for those, they're not allowed to recover for those costs at all. But they incur them. After the order is in effect, if those things are incurred, the facility has to pay the provider for that. The provider is not just on the hook for those particular costs. So after the order is in effect, the facility then would have to pay. That's why, for your example, about if Alabama thinks certain things are necessary, Alabama can pay for those things. It's just the incarcerated person is not allowed to be charged for those things because it's not a used and useful cost. But if Alabama requires it and doesn't pay, then the provider has to pay, correct? Well, if Alabama requires, so in that situation then you do have a site commission, but Alabama is requiring certain things of the provider in the same way that they may require a percentage of those revenues. And in that situation, that would be preempted under the order as an impermissible site commission. So just help me with this one. Say something like transcribing the phone call. That's deemed not necessary. Right. If the state of Alabama requires those still to be transcribed, is that treated as a site commission cost then that can be, a site commission that can be preempted? Yes, that's my understanding of the order. I don't think the order delves into that level of detail, but it defines site commission to include such in kind requirements from the provider to the facility, and it then preempts site commission as so defined. So I think that would be the consequence of the order's position. And again, in various places in the commission brief, it makes clear that that dynamic is true with respect to security costs as well, not just the sort of monetary payments. And so our view is not, and I wonder if this is potentially part of the reason why the commission is taking a more deliberate approach with respect to site commissions, is that the statute essentially requires the prohibition of site commissions given the fact that if the provider is forced to eat the cost of the site commission, then they're not being fairly compensated, but if the provider is permitted to pass that cost on to the incarcerated person, then the rates are not just unreasonable. So faced with that dilemma, what the commission did is it banned site commissions altogether. That seems to be not just statutorily permitted, but in fact statutorily required under the reasoning of the commission's order. Now the state's position, as discussed earlier, is that Section 276B1A doesn't explicitly reference practices. And our answer there is, again, the commission explained, is that the language of 276B1A refers broadly to establishing a compensation plan. That compensation plan extends beyond simply the rate itself. It extends to things that directly affect the rate, as site commissions obviously do. It directly reflects that site commissions increase the rate on average at 33 percent and up to 70 percent in certain jurisdictions. It's not like this was a hidden problem that's affecting rates. It's a very clear primary reason, as the commission says, for why rates are being increased. And so you just square, so I get it. And if you're not squaring it, that's fine. I thought the FCC just was taking the position that that fairly compensated language was effectively redundant or just emphasizing like an exclamation point on just and reasonable. This preemption argument seems to treat the fair compensation as doing independent work from the just and reasonable language, because the just and reasonable language gives us the used and useful framework. And notwithstanding that site commissions are not used and useful, nonetheless they can be preempted because of the independent mandate to ensure fair compensation. Is there a way to square those two positions? I know that it's a little bit odd. The FCC's articulated position about the meaning of those two phrases doesn't itself provide support for the preemption argument that you're now running, which depends on treating those phrases as having distinct substantive content. I don't know if they're distinct substantive content. I'd say they focus on two different actors in the calculation of the rates. So the fair compensation mandate is from the perspective of the provider, what would constitute fair compensation in the rates that they charge. Fair compensation for what? For those things that are used and useful. Yes, yes. You're getting that. The site commissions have nothing to do with that tough luck that you've got to pay this side payment. It has nothing to do with what fair compensation for those things that are used and useful are. The key factual circumstance here is the fact that the payment that is going for the site commission has to go somewhere. Someone has to pay for that payment. And so the commission said if that payment is banned from being passed on to the consumer because it would not be just and reasonable for the reasons you're articulating, then the provider would have to pay for those costs. Paying for something that's part of the used and useful service, that's all. So I'm just saying that makes fair compensation sort of for what? What do we mean when we're talking about fair compensation for what? Well, it's for the actual cost of providing the service. That's where you're saying the shift away from used and useful. Do you see what I'm saying? Yes, I see what you're saying, and I understand there's some tension there. I think inherent in the idea of fair compensation, I don't know if you necessarily need to go to the used and useful framework to say inherent in the idea of fair compensation is you're being paid for what you do. That's just what compensated means. And so fair compensation is what is your cost of providing something and are you receiving fair payment for providing that service. That hangs together whether or not the just and reasonable requirement is added to 276B, although we think the argument is strengthened when you have both of those mandates together. So with respect to the PAC study, as I said, we think that this is the site commission prohibition that naturally falls in the language of establishing a compensation plan under 276B1A, and also the commission notes that historically the pursuant to a justice fair compensation mandate, it has regulated beyond sort of narrow rates issues, and that sort of penumbra around the rates authority, we think extends to site commission payments here. It's sort of irrelevant that the commission or the Congress does not specifically adopt the work practices in 276B, given that other broader language in 276B1A. Is there any other suggestion in the statute that Congress intended to regulate the states? Yes. So there is the amendments that the Act makes to Section 152B, which is sort of the general reservation of state authority and sort of a non-preemption provision, and Congress in the Act amended that provision to make clear that 276 is an exception to that authority. So it's very clear that Congress was intended to expand the commission's preemption authority. Again, all of this is occurring in the context of Congress revisiting the GTL decision and trying to correct the conclusion in that decision that site commissions were simply a cost of doing business. By both expanding the preemption authority, adding just and reasonable to 276, preserving the 276C express preemption authority, all of that together I think makes clear that the commission was – Congress was certainly trying to address the problem of site commissions and preempt state practices, state requirements to the contrary. We also think independently that Section 201B provides totally sufficient authority to do the same thing, and number one, it's clear that that authority does extend to practices by its text. That authority, while limited to interstate and international services, can extend to interstate services when the interstate services are not severable from the interstate portion, and the commission in paragraph 338 of the order makes clear that there's no evidence that there's any way to separate the interstate and interstate aspects of a site commission. What you have in many cases is a single payment that's going from the provider to the facility. It's unclear how you would distinguish the interstate versus interstate components of that. That's all the more so in a situation where – What about the sheriff's argument that you just would write into the site commission these are for the interstate calls, not for the provision of the intrastate calls? Well, first of all, that's not what anyone is in fact doing here, but it wouldn't solve the problem, which is the separate problem that the commission identified, which is even if you could say, well, these site commissions are only for interstate calls, and if the commission were only to regulate that practice, the commission found that there would still be significant upward pressure from the remaining intrastate portion of the site commission, the existence of site commissions, and so that would continue to force a break in a way that would undermine the just and reasonable mandate. I think the idea was if you were relying on 201B entirely, you just couldn't reach an intrastate site commission. Would the preemption theory if it relies on 201B open it up, that then they could just go ahead with site commissions, but just keep saying this is a site commission for only the intrastate calls? And how would 201B give you any authority over that type of site commission? So I think the position set forth in the order, which we agree with, is that 201B, when you're describing it, it sounds to me sort of like a labeling exercise where they just assert that this is, and there would be a question whether in fact that's true, if the commission could look into, and the payment has to be provided for something. I'm not really sure how to understand how a payment to the state's general treasury fund is meaningfully understood as intrastate or intrastate at all. It's just sort of totally unrelated to the provision of the service. But assuming that there was some way, so I think there would be an initial question about that. Assuming that they say it's for intrastate and it is for intrastate, what the commission says is that even if you try to just regulate the intrastate portion, if there's still intrastate site commissions that are possible, it's going to push up the rates generally across the board because it's such a large portion of the rates that are being charged. And so there's no way practically, you would not be able to satisfy your statutory mandate to interject some reasonable rates under 201 by doing anything short of prohibiting the entire practice. And that is well-established SEC jurisdiction where if you can't satisfy the mandate under 201, you can reach into intrastate authority. So we think that there's still an argument that the entire thing would be preempted even in this sort of unusual hypothetical that you've posited. I'd just like to turn to the, I guess back to the safety and security costs question quickly. So as we understand that the commission is not planning to include all seven categories of safety and security costs in the rates, and we would just like to clarify that we don't think the statute would permit any such inclusion. Remember which side you're on now for purposes of this argument. Yes, I'm defending the exclusion of the five of the seven. So the FCC correctly excluded five of the seven. Hold off and see what happens. Yes, I understand. We don't need your argument about what might happen. I understand. So with respect to the five of the seven that the commission excluded, it explained, number one, that the statute just requires the commission to consider certain things. It doesn't say you must include these costs. It says you must consider these costs. And so inherently there's some discussion conferred on the commission to exclude certain costs. We think Section 4 makes clear that there's a broader category of safety and security measures that are related to IPCS that the states may continue to offer. It's very clear, in fact, it's a non-preemption provision saying, of course states are permitted to continue implementing safety and security measures that they think are necessary. Paired with the more confined language of Section 3b.2, we think it's clear that necessary to provide language is meant to identify a smaller universe of costs that can be passed on to the incarcerated person. And so with respect to the five category of costs the commission excluded, it correctly interprets that statutory authority to reject arguments that anything the state says needs to be included or that the statute compiles the inclusion or that somehow Section 4, by highlighting safety and security, has required the inclusion of those costs. We think none of those things follow from the statute. The statute is, in fact, doing the opposite in the context where, again, Congress recognized a problem after the GTL decision of rates being too high for too long and adopted a statute meant to target those costs, not include all the safety and security measures that various authorities were suggesting needed to be included. And just finally, the one other issue where the commission is not defending, the one other major issue where the commission is not defending its brief, but we have briefs and we are defending, is its treatment of the facility costs issue. So this is the question of whether the facility costs were appropriately treated, the two-cent additive that was added to the upper bounds, but without an additive added to the actual rates themselves. We think the commission's treatment there by declining to include the two-cent additive in the lower bounds was correct. There's simply no evidence in the record to support the existence of these costs at all. So this is the category of costs that facilities supposedly incur that are used and useful in the provision of IPCS. The commission's reasoning there made clear that it has for many years solicited data from states and sheriffs to prove the existence of these costs, and they have only received the 2015 NSA survey that the commission itself recognized was unreliable, that it used inappropriately broad descriptions of the activities, and so it does not provide any basis for determining exactly how much facilities themselves are paying for safety and security measures. Secondarily, the commission rejected a submission from PHR, one of the providers, that had tried to quantify facility costs, concluding that it didn't even distinguish between costs incurred by facilities versus providers, and that it was using an unrepresentative sample of 30 smaller facilities that don't, again, in the provision of safety and security costs. And so we think given the entire dearth of evidence in the record as to any facility costs, in fact, being incurred by facilities, the commission correctly declined to just adopt an across-the-board additive for facilities, sort of on the assumption that these costs exist. It did so while reasonably making clear that if, in fact, a facility does incur any particular costs of that kind, the provider is free to reimburse the facility for those costs, and so that is a totally sensible way of operating in a context where there is no clear evidence that any such cost, in fact, is in the system at all. Just one last question before you sit down. On this practices point, how do you propose we deal with the seeming contention that 201B provides the authority and so does 276, but the word practices is in 201B and is conspicuously not in 276?  So we don't think that this is sort of a specific governing the general, or there's some sort of implied repeal going on between these two provisions. 201B is sort of the broad reservoir of authority for the commission, and so I guess the way this cashes out practically is the arguments by which one would justify preemption of site commission costs under 201B are different from the arguments by which one would justify it under 276. Correct. So the text has practices in one and not the other, so if you do it by 201B, practice is easy, but then you have this a little bit rococo argument about interstate, interstate. Yes. If you go 276B, if I'm following, you said it's straightforward, compensation, fair compensation plus just a reasonable rate, couldn't need to do a mandate otherwise, but then you have this problem of that we know practices is in this other provision and it's not here, so what would lead us to think that those two mandates together impliedly meant you can touch a practice even though we didn't give you authority to regulate them? Yes. So I think you could just decide on 201 on its own if you wanted, and then you would have the practices authority, and we think the record is clear that there's no evidence of being able to disaggregate, so it would be very straightforward in resolving the entire issue. With respect to 276, we think, yes, formally they didn't use the word practices, but they effectively used the word practices by using a broader set of terms to establish a compensation plan, and so we don't think you need to parse it that narrowly, and we don't think it would make sense to understand, which I think the state's argument was a stronger argument, that somehow 276. Just on this last point, just to figure out what would follow on 276 if you did this out of theory, I take it there's a whole range of things that historically have been understood to count as practices as opposed to charges for purposes of 201B? Yes. Is your position that all of those things also then are imported implicitly into 276B so that anything that would be a practice under 201B is now subject to being preempted under 276B? I mean, I'm not the lawyer for the FCC, but I don't think that that necessarily follows, and I don't think the commission— How would you stop that from following? Yes, so it is to establish a compensation plan is a relevant language, and so it would have to be certain practices that go to the effect on rates in a sort of very connected, direct connection kind of way, so you couldn't ensure the compensation to the provider was fair if you didn't regulate this particular aspect of the provider's practice. I don't think that necessarily includes the practice authority under 201B, which is far more expansive and wouldn't necessarily be tied to any effect on rates, for example. That's a clear distinction between 276 and 201B. Here, we think the authority is limited to rates, but it wouldn't surprise me. The commission hasn't sort of done this, and if the commission has a different view, we would, of course, analyze it, and if the commission wants to assert broader authority, we're not saying they're foreclosed, obviously. It's just we don't think that that's necessary. Are there no further questions? Thank you. Thank you, counsel. At this time, would the Council for Secure Technologies, as the respondent, please introduce themselves on the record, if you can. Three minutes? Wasn't it three minutes? Oh, this is where the sole respondent is. Thank you, Your Honor. Justin Berg for Securus in the role as intervener in partial support of the FCC's order. I'd like to focus on something we haven't discussed today, which is the FCC order's determination to permit alternative pricing plans. The court should affirm that decision and reject the public interest petitioner's challenge to it. Just for background and as a reminder, an alternative pricing plan refers to any kind of pricing plan other than a permanent rate structure. And so here it refers to a flat rate plan, where instead of paying the permanent rates, a consumer will purchase in bulk a set of minutes or calls for a single flat price. These kinds of plans have benefits for both providers and consumers. Consumers, if they use a sufficient number of the minutes that they purchase, can end up paying a lower effective permanent rate than they otherwise would have paid under the permanent rates, just like any other kind of wholesale deal. Providers, on the other hand, enjoy predictable revenue streams and lower administrative costs because flat rate plans are simpler to administer, and they can pass those lower costs on in the form of lower prices. The commission agreed that these plans could be beneficial to consumers and providers based in large part on Securus's successful pilot program, which offered these plans and was very successful and well received. The commission adopted several important consumer protections, and most relevant here, one of those rules is called the break-even point rule. And a break-even point refers to the amount of usage that a consumer must use, the amount of minutes or calls that they must use, to pay a rate that is equal or lower than the applicable permanent rate caps in their facility. The FCC required that every plan contain a break-even point, and that sufficed to ensure just and reasonable rates under this kind of an alternative structure. The public interest petitioners in their brief contend, however, that the FCC erred because it was also required to adopt a rule that would mandate that providers issued mandatory refunds to any consumer who fails to break even, to effectively guarantee that consumers always pay the permanent rate caps. The court should reject that argument for two reasons. First, on the substance, a mandatory refund rule would be self-defeating. It would eliminate the economic incentive for providers to offer these plans, and it would deprive providers of their benefit of the bargain. The benefit, again, is predictable revenue streams and lower administrative costs, and both of those things disappear if providers must track usage for every customer, calculate unique per-customer refunds, and pay those refunds. There's no longer a predictable revenue stream, and the simplicity of the plan is gone as well because we're effectively reverting back to the more costly per-minute assessment for every consumer. Second, the FCC articulated precisely that rationale in multiple portions of its order. Paragraphs 462 and 464, when rejecting two analogous proposals for 462, it was a mandatory refund rule if someone cancels one of these plans because you can cancel at any time and go back to permanent rates. In paragraph 464, the FCC rejected a similar proposal for you should roll over unused minutes if someone doesn't break even. In both of those paragraphs, the FCC explained that a mandatory refund regime would eliminate the economic incentive to offer these plans that are beneficial to consumers. That explanation was sufficiently reasoned to withstand the public interest petitioner's argument that the FCC failed to explain itself. Under State Farm, the test is whether an agency's reasoning can be discerned from the face of the order. Those two paragraphs make clear that here it can, so this court should affirm. With that, Your Honors, I will rest on our brief unless you have other questions. Our position on the safety and security costs issue is that clearly there are going to be more developments, and so we believe it's not useful for anyone to address the inclusion of one category when the FCC is going to be redoing those categories. Thank you. Thank you, Counsel. At this time, the securist as petitioner will introduce himself for the three-minute rebuttal. Thank you, Your Honors. Scott Engstreich, returning for rebuttal. Judge Howard, you had asked Counsel for the commission whether before the Martha Wright Reid Act they had been using Section 201B for interstate rate setting, and Mr. Craigmouth, but the answer is yes. This is at page 9 of the FCC's brief. They cite two orders. At page 11 of our reply brief, we cite four other orders, including one that notes that they've been doing that since 1998 for payphone calls. So Congress's addition of just and reasonable into 276 was not a sea change for the way the FCC deals with interstate rates. And GTEL held that when the FCC tried to treat the two as coextensive, they were wrong. And then Congress doesn't change the all-providers-must-be-fairly-compensated language. Change is what they have to be compensated for, no longer each and every call, now all of them. But when Congress changed aspects of the GTEL decision, but not this one, I think it follows that Congress meant to preserve the requirement that all providers be fairly compensated. You heard Mr. Raimondi relying on that for some of his arguments. I think it means what GTEL still said it meant. Second, Judge Howard, you asked some questions about the interstate-intrastate calls, and we cite this at page, I think it's 13 in one of the footnotes. I wrote it down. I apologize, I had the page here, but I've got lots of pages. But the FCC, I see there's page 13, footnote 10 of our reply brief. The FCC in 2020 and 2021 concluded that because of the proliferation of wireless phones and VoIP calling, where you can move your VoIP device around and use it from any location, that prison providers could not, in fact, reliably determine which calls stay within the state and which ones can't. And it was actually those decisions that destroyed or forced Securus to pull off the market its alternative pricing plans. And so I just wanted to clear up this notion that we as providers actually are able to figure out which calls stay in the state and which calls don't. Obviously, we know where the prisons are, but we don't know where the other person is, even if we know their telephone number. Last, on venue. On state commissions, do you have any dog in that? We don't have a dog in that. Obviously, if we're required to pay them, we still agree with G's hell that, therefore, we have to be compensatable for them in some way. But whether they should exist or not, it's not a position we've taken in this case. On venue, we do think the court should decide it now. I'd note that Section 2112 is not a rights-conferring statute. Nobody has a right to a lottery. It's simply a mechanical process for addressing what happens when multiple people file timely petitions. And the reason this court should decide now if I can finish, Your Honor, here's how the schedule's going to work. On October 28th, they're going to take a vote. They typically then engage in editorial privileges, fixing typos and whatnot. The final order will be released probably a week later. Something will get sent to the Federal Register. Three or four weeks after that, it'll get published. At that point, the 10-day clock will start. We can't, as securists, right? My client's home is in Texas. We can file in the Fifth Circuit. We can file in the D.C. Circuit. Those are the places we have venue. Other parties have their own venue. So petitions will be filed in multiple circuits. They can't all be filed here. There's no venue rule that lets you bypass the normal rule. And then if the FCC holds a lottery, there will be a motion to transfer under the same order rule. I think Mr. Romerty and I agree that somebody will be filing that. So I don't think this court can evade the venue question, and I think the court, whether it's on the interest of justice standard, I think filing 2112 is in the interest of justice, and not allowing jurisdictionally defective petitions to control the venue, I think goes a long way towards furthering those interests. I'm over my time, and I appreciate the court's indulgence in consideration of everybody's arguments today. Thank you, counsel. At this time, when counsel for State of Louisiana had off, please reintroduce yourself. Thank you, Your Honor. Kelsey Smith for the State. I'd like to first note that the FCC's letter that was filed on Friday affirmatively says that it is both abandoning and not authorized to defend certain arguments. But then I'll turn it into a State commission payment. Generally, we apply to interstate and international communications, and so sure, that might exist in this context. But as we've discussed, you can differentiate between intrastate and interstate. So the States maintain that there is no statutory authority to ban site commission payments. But given the context of this case and where we're at, perhaps the clearest way to resolve the site commission argument is to vacate it for being arbitrary and capricious. And I'd like to quickly touch on two reasons why. The first is that the order is internally inconsistent. The order changes the definition of what site commission payments are. It says that the order allows providers to reimburse facilities for any used and useful costs that they incur in enabling ITCS. And so in the order's mind, that removes what could have been included in site commission payments for safety and security or facility costs. But then it also says that that ties into the used and useful analysis. And that, I think, Judge Barron, you were getting at, ties into what is required to be necessary. And so it's just a circle of if you're not allowed to include these in site, these are exempt from site commission payments and are used and useful, but the definition of used and useful doesn't include them, then they're not included. And so it's the same idea either way. The second point is that the record shows that the facilities do incur significant reoccurring costs to enable safe calling. And elimination of a principal funding method, while assuming no decline in access, is unreasonable. The CQ's response to that is simply that the states will not stop providing IPCS. But the record demonstrates repeatedly from different states that no one is served if IPCS is no longer provided. But that the states, if they're not able to have funding for these safety and security measures, will stop providing it. And that contravenes the whole purpose of the NWRA, which is to allow inmates to contact people and to have access to these facilities. Unless the court has any other questions. Thank you. We would ask that the court vacate the order. Thank you, counsel, at this time. And counsel for direct action for rights and equality. As petitioner, please reintroduce himself on the record. Arjun Ramurti for the Public Interest Petitioners. Just quickly on the alternate pricing plans. So our view on that issue is, yes, they do have commerce. They do have the potential to lower costs for incarcerated people. But the commission failed to consider at all the possibility that there may be low usage that would result in incarcerated people paying higher rates or their loved ones paying higher rates than the effective rate set in the plan, and entirely failed to consider the true vote mechanism that was proposed in the comments before the agency. My friend on the other side has suggested other discussions of other refunds. We don't think that's responsive to the question of whether refunds make sense here, particularly where other aspects of the order do allow for refunds, say in a situation where an incarcerated person is transferred or released. And so it's not just sort of a general anti-refund rule adopted in the order. There are certain contexts in which refund is warranted, and it's not clear why that wouldn't be warranted here. Finally, this has the feel of an abstract remaking case, but this is an issue that's very important to incarcerated people and their loved ones. This is going to how much families pay to stay in touch with their loved ones, and we urge the court to decide whether the live issues remain to ensure the rates are just and reasonable. Thank you. That concludes the argument in this case.